IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ROBERT STROUD, individually and as | : | CIVIL ACTION |
| administrator of the ESTATE OF JAMES | : | |
| H. STROUD, deceased, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| ABINGTON MEMORIAL HOSPITAL, | : | |
| et al., | : | |
| | : | |
| Defendants. | : | NO. 06-4840 |

**MEMORANDUM OPINION**

DAVID R. STRAWBRIDGE
UNITED STATES MAGISTRATE JUDGE                      May 13, 2008

This is a medical malpractice action that arises out of the death of plaintiff's decedent James

H. Stroud ("James Stroud" or "James") on October 30, 2004.  James Stroud had been admitted to

Abington Memorial Hospital ("Hospital") on October 25, 2004 for a total right knee replacement.

During the course of this and a second admission on October 29, 2004 he developed complications

that ultimately lead to his death on October 30, 2004.[1]

Plaintiff Robert Stroud ("Plaintiff"), James Stroud's son, in both his individual and

representative capacity has sued Hospital and defendants Joseph Cyril McAllister, M.D. ("Dr.

McAllister"), Jeffrey L. Wanner, M.D. ("Dr. Wanner"), Abington Plaza Medical Associates

("Medical Associates"), John W. Breckenridge, M.D. ("Dr. Breckenridge"), Frank R. Domeracki,

M.D. ("Dr. Domeracki"), Radiology Group of Abington, P.C.  ("Radiology Group"), Andrew M.

Star, M.D. ("Dr. Star"), Asif Ilyas, M.D. ("Dr. Ilyas"), Abington Orthopaedic Specialists, P.C. t/a

---

[1]Jurisdiction has been conferred upon this Magistrate Judge pursuant to 28 U.S.C. §
636(c) and Local Rule of Civil Procedure 72.1.  (*See* Doc. 104.)

Orthopaedic Specialty Center ("Orthopaedic Specialty"), Robert S. Charles, M.D. ("Dr. Charles"), and Urology Health Specialists – Abington ("Urology Health"), all of whom in one way or another were involved in James Stroud's treatment and care.

Presently before us for decision are two separate motions for summary judgment, the first by Radiology Group, radiologists Drs. Domeracki and Breckenridge, Medical Associates, and internist Dr. Wanner, and the second by Urology Health, urologist Dr. Charles, Orthopaedic Specialty, orthopaedist Dr. Star, and then-orthopaedics resident Dr. Ilyas (collectively "Moving Defendants"). (Docs. 111-117.)[2] In that both motions raise similar arguments and Plaintiff has filed a single combined responsive brief in opposition, we address both motions together here. (Docs. 119-121.)

Moving Defendants argue that Plaintiff's claims against them should be dismissed as time-barred. It is undisputed that Plaintiff did not join Moving Defendants as parties to this case until more than two years after James Stroud's death and that Pennsylvania's two-year statute of limitations applies to Plaintiff's claims. Moving Defendants argue that the limitations period expired before they were joined as parties, that the discovery rule did not toll the accrual of the statute of limitations, that the fraudulent concealment doctrine did not toll the running of the limitations period, and that Plaintiff's claims against them do not otherwise relate back under Fed. R. Civ. P. 15(c) to the date Plaintiff filed his initial Complaint.

In this Opinion we first consider whether as a matter of law the discovery rule applies to Pennsylvania-law wrongful death and survival actions. We then address whether the fraudulent

_____

[2]The two remaining defendants, Hospital and internist Dr. McAllister, are not parties to either of the motions for summary judgment.

concealment doctrine applies and whether Plaintiff knew or reasonably should have known of those facts which would arguably support his claims notwithstanding any nonproduction of certain medical records.  To the extent that this doctrine might be said to apply, we next consider whether Plaintiff has presented sufficient evidence to establish that each of Moving Defendants engaged in an affirmative act of concealment which would trigger the fraudulent concealment doctrine.  Finally, we address whether Plaintiff has demonstrated that his joinder of Moving Defendants relates back under Fed. R. Civ. P. 15(c) to the date of filing his initial Complaint.

### I.       FACTUAL BACKGROUND & PROCEDURAL POSTURE

#### A.       James Stroud's Death

James Stroud was admitted to Hospital for a total right knee replacement on October 25, 2004. (Doc. 45 at 11, ¶ 46.)  Following surgery, he remained at Hospital under the medical care of various of the defendants and others. (*Id.* at 11-14, ¶¶ 47-68.)  Plaintiff alleges that during that time, James Stroud complained of nausea and failed to have a bowel movement. (*See, e.g.*, *id.* at 11, ¶¶ 50, 52.)  Plaintiff further alleges that, while various of the defendants and others examined and treated James Stroud, they failed to adequately diagnose and treat his emergent medical condition, later found to be a bowel obstruction or ileus. (*Id.* at 11-14, ¶¶ 51-68.)

More specifically, Plaintiff contends that Dr. Paul Crispen, a urology resident under the supervision of urologist Dr. Charles ordered an abdominal/pelvic CT scan to be performed on James Stroud on October 28, 2004 to investigate the cause of his lack of bowel movement. (*Id.* at 12, ¶ 58-59.)  According to Plaintiff, the CT scan revealed "marked dilation of the small and large bowel, representing either an obstruction or adynamic ileus," but that no action was taken in response to this finding of a potentially serious medical condition. (*Id.* at 14, ¶ 68-69.)  Plaintiff attributes this

inaction, at least in part, to the failure of the various treating medical professionals to communicate adequately about James Stroud's care and the failure by Hospital to have in place and/or to properly enforce policies and procedures for interdepartmental communication. (*See, e.g.*, *id.* at 19-21, ¶ 105(n), (q), (r), (aa)-(cc).)

That same day that the scan was performed, October 28, 2004, James Stroud was discharged from Hospital to Brookside Healthcare and Rehabilitation Center ("Brookside"). (*Id.* at 14, ¶ 70.) The following day, October 29, 2004, he complained of abdominal pain and began vomiting. (*Id.* at 15, ¶ 73.) He was taken by Second Alarmer's Rescue Squad ("Second Alarmers") ambulance to Hospital's emergency room early that afternoon and was subsequently readmitted. (*Id.* at 15-16, ¶¶ 74-80.) He was examined and additional diagnostic testing, including an abdominal x-ray series, was ordered, completed, and interpreted later that evening. (*Id.* at 16-17, ¶¶ 81-95.) By about 11:20 p.m. he began vomiting, became unresponsive, and was unable to be revived. (*Id.* at 17, ¶¶ 96-98.) He was pronounced dead at 12:08 a.m. on October 30, 2004. (*Id.* at 17, ¶ 98.)

### B.     Plaintiff's Investigation into James Stroud's Death

On November 1, 2004, just two days after James Stroud died, Plaintiff contacted and retained counsel to investigate the circumstances of his father's death. (Doc. 15-1 at 4-5, ¶¶ 8-11; Doc. 112-17 at Ex. 27.) On November 29, 2004, Hospital directed that all of James Stroud's medical records be removed to a locked legal file in light of the potential for litigation concerning his death. (Doc. 121-13 at Ex. 12.) In the course of investigation, Plaintiff's counsel thereafter proceeded to request medical records from various of the individuals and entities involved in James's treatment.

4

1.      **Records Produced by Hospital in Response to Plaintiff's December 2, 2004 Request**

On December 2, 2004, counsel requested James Stroud's complete medical records from Hospital.  (Doc. 112-2 at Ex. 2.)  Hospital produced responsive records, which counsel received on or before January 5, 2005.  (Doc. 15 at 4, ¶ 13; Doc. 112-2 to -6, Exs. 3A-4B.)  The documents produced were:

1.      A chart reference from October 25, 2004 that noted that James Stroud's "last BM [was on] 10/25/04[,]" the day the knee replacement surgery was performed.[3]  (Doc. 112-3, Ex. 3B at PL 0039.)

2.      A patient functional status chart, dated October 27, 2004, that noted that James Stroud was complaining of nausea.  (Doc. 112-4, Ex. 3C at PL 0099.)

3.      A urology consultation report, dated October 27, 2004, that recorded Dr. Charles' observations and report from his visit with James Stroud, where Dr. Charles noted that James had not had a "BM since surgery."  Dr. Charles also issued an instruction to "maintain foley [catheter] until pt ambulating well & having BMs."  (*Id.* at PL 0079.)

4.      A chart reference from October 27, 2004 that noted that James had not had a bowel movement and that he was given a Dulcolax suppository, and a nursing observations chart dated October 27, 2004 that stated "Dulcolax suppository given as ordered for [complaints of the absence of] BM."  (Doc. 112-2, Ex. 3A at PL 0019, 0024.)

5.      A nursing observations chart dated October 28, 2004 that reported that James was complaining of nausea and was scheduled for an abdominal CT scan later that day.  (*Id.* at PL 0014.)

_____

[3]Medical records produced by Brookside indicate that James Stroud's last bowel movement was on October 24, 2004, the day before the surgery.  (*See infra* at 11.)

6.      A chart note from 7:15 a.m. on October 28, 2004 by urologist Dr. Charles reflecting his observations of his consultation that day with James Stroud, where Dr. Charles noted that James had not had a bowel movement and that a CT scan had been ordered.  The chart note also bore a stamp indicating that a CT scan of James's abdomen and kidneys was completed at 9:50 a.m.  (Doc. 112-3, Ex. 3B at PL 0074.)

7.      A printout of a daily medications summary that showed that James Stroud was given Senokot, a laxative, on October 28, 2004.  (*Id.* at PL 0059.)

8.      A printout of an admissions form from James Stroud's readmission to Hospital on October 29, 2004 that listed his chief complaint as "vomiting" and notes that he is "unable to keep food or meds down."  (Doc. 112-5, Ex. 4A at PL 0154.)

9.      A medical history from James Stroud's readmission to Hospital on October 29, 2004 that listed his chief complaint as "nausea/vomiting."  It also notes that James was discharged from Hospital the day before, following knee replacement surgery performed by Dr. Star.  (*Id.* at PL 0158.)

10.     A printout of a patient database chart relating to James Stroud's October 29, 2004 readmission that listed his chief complaint as "vomiting" and stated that he is "unable to keep food or meds down."  (*Id.* at PL 0169.)

11.     A Department of Medicine Assessment and Plan from October 29, 2004 that listed "nausea" and "vomiting" as some of the medical problems with which James Stroud presented. Under the heading "GI," it further states "obstruction" and "obstruction series."  (*Id.* at PL 0161.)

12.     An Emergency Trauma Center Nursing Assessment Flow Sheet from October 29, 2004 that stated that James Stroud's last bowel movement was on October 24, 2004 (before his first

admission to Hospital for knee replacement surgery).  The Flow Sheet also noted that James's abdomen was large, distended, firm, and non-tender, and that he has hypoactive (reduced) bowel sounds.  (*Id.* at PL 0166.)

13.    A chart note from October 29, 2004 that reported that James Stroud had a "firm, distended abdomen."  (*Id.* at PL 0134.)

14.    Progress notes from October 29, 2004 that indicated that James Stroud still has had "no BM" and that an obstruction x-ray series was completed that day.  The notes then go on to detail James's death and the fact that he was "vomiting coffee ground emesis" immediately before he became unresponsive.  (*Id.* at PL 0162-PL 0164.)

15.    A printout of a daily orders report that indicated that James Stroud was scheduled on October 29, 2004 for "Radiology – Diagnostic: Abdomen Obst w/Chest, Indication: Obstruction," and a printout of a daily orders report that indicated that James Stroud was scheduled on October 29, 2004 for "Radiology – Diagnostic: Abdomen Obst w/Chest, Indication: Vomiting, Schedule: Stat." (*Id.* at PL 0144, 0147.)

16.    The radiology report approved by Dr. Domeracki interpreting the obstruction series of x-rays taken of James Stroud's abdomen on October 29, 2004.  The report stated:

> Final abdomen obstruction [with] chest history:  vomiting.  Two views of the abdomen were obtained.  The study is limited as the abdomen is not entirely included in the radiographs. There is marked distention of bowel, particularly small bowel. Gas also appears [to] be present within the colon.   Findings may represent bowel obstruction or ileus.  It is difficult to further characterize.  There is density in left upper quadrant which may represent fluid filled stomach.  Free air cannot be evaluated for adequately on these limited study.   Impression: Limited study shows dilated bowel.  Bowel obstruction cannot be excluded.

(Doc. 112-6, Ex. 4B at PL 0183.)

17.     A nursing observations chart note from October 29, 2004 that noted that the x-ray "obstruction series [was] done" at 8:00 p.m. and that at 11:20 p.m. James Stroud began "vomiting dark brown coffee ground emesis" and then immediately became unresponsive and could not be revived.  (Doc. 112-5, Ex. 4A at PL 0139-PL 0140.)

18.     A discharge summary from James Stroud's second admission to Hospital by Dr. McAllister, dictated by Dr. Eric Mueller.  It reported that "Patient comes in with a chief complaint of nausea/vomiting and shortness of breath."  The summary notes that James was readmitted to Hospital, following his initial discharge to Brookside after the knee replacement surgery performed by Dr. Star.  Among other things it reported that: "He was sent for an obstruction series to evaluate his abdominal distention, nausea and vomiting."  The summary also noted that James was "vomiting coffee ground emesis" immediately before he became unresponsive and died.  (*Id.* at PL 0126-PL 0127.)

> **2.     Records Produced by Hospital in Response to Plaintiff's Requests of January 5, 2005, February 27, 2005, and May 9, 2006**

On January 5, 2005, counsel requested from Hospital copies of the films from the October 29, 2004 x-ray series, having concluded that such films were not produced by Hospital in response to the initial December 2, 2004 records request.  (Doc. 112-7 at Ex. 6.)  Hospital produced the films to Plaintiff in the ordinary course of business.  (Doc. 111-1 at 5.)[4]  On January 27, 2005, counsel

_____

[4]The exact dates upon which documents responsive to some of Plaintiff's requests were produced is not entirely clear from the summary judgment record before the Court.  Putting aside questions as to the completeness of any particular productions, however, it does not appear disputed that the records that were produced were produced within a reasonable period of time following the requests, and prior to the expiration of the limitations period.  We therefore assume based on the record before us that, to the extent the exact date of production is unknown, the

requested from Hospital complete copies of all medical bills for James Stroud's treatment at Hospital.  (Doc. 112-7 at Ex. 7.)  Hospital thereafter produced responsive records in the ordinary course of business.  (Doc. 112-7 at Ex. 8; Doc. 111-1 at 5.)

On May 9, 2006, counsel requested James Stroud's complete medical records from Hospital's Emergency Department, having concluded that such records had not been produced.  (Doc. 112-7 at Ex. 9.)  The Emergency Department records were then produced in the ordinary course of business.  (Doc. 112-8 at Ex. 10; Doc. 111-1 at 5-6.)  Among others, Hospital produced the following documents:

1.      An Emergency/Trauma Center intake form dated October 29, 2004, from James Stroud's second admission to Hospital, which stated a chief complaint of "vomiting."  It noted that James was being readmitted into Hospital from Brookside, following his earlier post-surgery discharge, and it stated that "[t]hrough the night and this morning the patient became short of breath and began having some vomiting and was unable to keep food or medications down. . . ."  It further reported that James's "abdomen has hypoactive bowel sounds."  Finally, among the differential diagnoses listed is "postoperative ileus."  (Doc. 112-8, Ex. 10 at PL 0397-PL 0398.)

2.      A duplicate copy of Emergency Trauma Center Nursing Assessment Flow Sheet from October 29, 2004 discussed above (*see supra* at 6-7, PL 0166), which stated that James Stroud's last bowel movement was on October 24, 2004, that his abdomen was large, distended, firm, and non-tender, and that he had hypoactive (reduced) bowel sounds.  (*Id.* at PL 0392.)

_____

records were produced reasonably promptly and in the ordinary course of business.

3.   **Records Produced by Dr. Star/Orthopaedic Specialty, Dr. Maron, Brookside, and Second Alarmers**

On December 7, 2004, counsel requested from Dr. Star/Orthopaedic Specialty James Stroud's complete medical records relating to the knee replacement surgery and admission to Hospital.  (Doc. 112-1 at 2-3, ¶ 8.)  Dr. Star/Orthopaedic Specialty produced responsive records on December 29, 2004.  (Docs. 112-5 & 112-6 at Exs. 5A-5B.)  On December 23, 2004, Plaintiff's counsel received James Stroud's complete medical records from Dr. Jeffrey Maron, James Stroud's primary care physician.  (Doc. 112-8, -9 & -10 at Exs. 11A, 11B & 11C.)

On December 15, 2004 and February 14, 2005, Plaintiff's counsel received James Stroud's complete medical records and billing records, respectively, from Brookside, the rehabilitation center into which he was discharged on October 28, 2004.  (Doc. 112-11, -12 & -13 at Exs. 12A, 12B, 14.)  The documents include, among other items:

1.   A chart note dated October 28, 2004 that reported that James Stroud's last bowel movement was Sunday [October 24, 2004]– that is, the day before his knee replacement surgery. It also reported that an order for the laxative Senokot was received.  (Doc 112-11, Ex. 12A at PL 0315.)

2.   A medications chart showing that James was given the laxative Senokot on October 28, 2004.  (Doc. 112-12, Ex. 12B at PL 0334.)

3.   Progress notes dated October 29, 2004 by a medical attending physician at Brookside which reported that James Stroud was complaining of abdominal pain.  The notes also contained a notation to rule out acute abdominal process.  (Doc. 112-11, Ex. 12A at PL 0311.)

4.   Nurse's notes from October 29, 2004 that reported that James Stroud began vomiting,

10

vomited up all of his medications, and was transported back to Hospital by ambulance. (*Id.* at PL 0316.)

By January 22, 2007, when Plaintiff exchanged initial disclosures with Hospital and Dr. McAllister, Plaintiff's counsel received James Stroud's complete medical and billing records from Second Alarmers, the ambulance service that transported him back to Hospital from Brookside on October 29, 2004. (Doc. 112-12 & -13 at Exs. 13, 15.) Those documents included, among others: A Pennsylvania EMS Report dated October 29, 2004 concerning Second Alarmers transportation of James back to Hospital from Brookside on that day. The report stated that he was presenting with "nausea" and "vomiting" and had a "distended" and "guarding" abdomen. It noted that "Pt's family was with him [at Brookside] and reported that he had been vomiting for the last hour. They also reported that facility staff had not given him his medications due to his not being able to keep anything in his stomach." (Doc. 112-12, Ex. 13 at PL 0383-PL 0384.)

### 4. Autopsy of James Stroud

In addition to requesting James Stroud's medical records from various of the medical professionals involved in his treatment, Plaintiff also had an autopsy performed on James by a forensic pathologist. In a report dated February 21, 2005, the forensic pathologist concluded:

> Internally, the most serious acute pathologic finding was the presence of gastrointestinal ileus with extensive fluid accumulation. This finding suggests that [James Stroud's] gastrointestinal tract was not functioning properly and fluid was accumulating within. Ileus is a recognized post operative complication. This finding should be clinically correlated with his symptoms, findings and laboratory evaluation.

(Doc. 127-2, Ex. A at PL 0685.) Elsewhere, the pathologist also noted: "Upon opening the abdominal cavity, it is obvious that the entire gastrointestinal tract is abnormal." (*Id.* at PL 0691.)

**5.     Plaintiff's and His Sister's Observations of James Stroud During His Hospitalization**

Plaintiff and his sister additionally had firsthand knowledge of James Stroud's symptoms, having visited him and spoken with him during the course of his treatment at Hospital and Brookside.  Lynn Stroud, Plaintiff's sister, testified that she visited her father on October 26, 2004, the day after the knee replacement and that he remarked to her that "he wasn't able to eat anything, keep anything down, and that he hadn't made a bowel movement."  (Doc. 127-2, Ex. D at 52.)  She visited him again on October 27, 2004; he complained to her of nausea, and he remarked that "[h]e was still feeling lousy, . . . still not being able to put anything in his stomach[,] . . . and again he hadn't made a bowel movement."  (*Id.* at 63-64.)  Ms. Stroud visited her father again the following day after he was discharged to Brookside; he again told here "that he hadn't made a bowel movement, he still wasn't able to keep anything [in] his stomach."  (*Id.* at 80.)  Ms. Stroud also touched her father's stomach and noted that it "felt kind of hard" and that it "looked like it was extended out some, hard and . . . puffy."  (*Id.* at 80, 85.)

Plaintiff similarly testified to what he noticed of his father's symptoms during visits and conversations with him during James Stroud's time at Hospital and Brookside.  He stated that his father complained the day after the knee replacement surgery "that he hadn't had a bowel movement."  (Doc. 127-2, Ex. E at 25.)  Plaintiff testified that during a conversation with his father the following day, October 27, 2004, his father "was still complaining about not feeling too well, still not -- having anything to eat, no bowel movement."  (*Id.* at 26.)  The following day, he testified, "[i]t was still the same thing, not being able to eat, not going to the bathroom. . . ."  (*Id.* at 29.)  Plaintiff visited his father again on October 29, 2004; James Stroud again mentioned that he was "having

problems with his stomach" and that it was getting swollen, which was also visible to Plaintiff.  (*Id.* at 40.)

### C.   Plaintiff's Assertion of Claims Against Moving Defendants

Plaintiff commenced this action by Complaint filed on October 30, 2006, exactly two years from the date of James Stroud's death.  (Doc. 1.)  This initial Complaint named only Hospital and Dr. McAllister as defendants.  (*Id.*)  It asserted negligence, survival and wrongful death claims against them based upon the events that transpired following James Stroud's readmission to Hospital on October 28, 2004.  (*Id.*)  By Plaintiff's admission, the initial Complaint did not plead claims relating to Plaintiff's care and treatment during his first admission to Hospital from October 25 through October 28, 2004.  (Doc. 15-1 at 2-3, ¶ 7.)

After the then-parties exchanged their Fed. R. Civ. P. 26(a) initial disclosures on January 22, 2006, counsel for Hospital and Dr. McAllister concluded that Hospital had some additional medical records for James Stroud that had not been produced to Plaintiff before the commencement of this action and expiration of the limitations period.  (Doc. 111-4 at Ex. N.)  Hospital's counsel thereafter produced to Plaintiff's counsel on February 7, 2007 copies of those additional medical records that were discovered not to have been previously produced.  (Doc. 111-4 at Ex. Q.)  Among the additional records produced to Plaintiff for the first time on February 7, 2007 was a radiology report interpreting the October 28, 2004 abdominal CT scan performed on James Stroud (the "Radiology Report").  (Doc. 122-4 at Ex. 3.)  The Radiology Report stated, among other things:

> There is marked dilation of small and large bowel.  The large bowel
> is dilated to the level of the proximal descending colon.  One cannot
> be certain if there is an obstructing lesion in this location or if there
> is adynamic ileus or ischemia.

(*Id.*)

No defendant produced the Radiology Report to Plaintiff prior to February 7, 2007.  (*See, e.g.*, Doc. 111-4 at Ex. Q.)  During the course of discovery, Plaintiff elicited testimony to the effect that the Radiology Report would have been distributed to several of the defendants contemporaneous with its transcription.  (Doc. 121-14, Ex. 13 at 62-63.)  Ronald DeShazo, Hospital's manager of radiology information systems, testified that the Report would have been distributed to:  Dr. Paul Crispen, a urology resident under the supervision of Dr. Charles; Hospital's Urological Department; Medical Associates; Dr. Ilyas, the orthopaedics resident; Dr. Maron, James Stroud's primary care physician; and others not involved in this litigation.  (Doc. 121-14, Ex. 13 at 62-63.)  Among these, Drs. Star, Charles, and Domeracki deny having received or reviewed the Radiology Report prior to this litigation and the expiration of the limitations period.  (Doc. 121-17, Ex. 16 at 316-19; Doc. 121-18 at 136-38; Doc. 121-23, Ex. 22 at 13, 23-24.)  The summary judgment record is silent as to whether Medical Associates and Drs. Crispen, Ilyas, and Maron deny or acknowledge receipt of the Radiology Report before the limitations period expired.

There are several references to the October 28, 2004 CT scan in the other medical records produced by Hospital prior to the expiration of the limitations period.  (Doc. 111-3, Ex. M at AMC-CC-0009, 0014, 0051-0054, 0071, 0081.)  There are no references, however, to the Radiology Report itself.  (*See* Doc. 121-1 at 6, 28-29.)

On March 7, 2007, 128 days after the Complaint was filed, Plaintiff's counsel reviewed for the first time the additional medical records produced by Hospital on February 7, 2007.  (Doc. 111-4 at Ex. S.)  Included in this material was the Radiology Report.  (*Id.* at Ex. Q.)  The next day Plaintiff's counsel communicated with counsel for Hospital and Dr. McAllister, seeking consent to

14

amend the Complaint based upon the Report. (*Id.* at Ex. S.) Defense counsel declined to consent, and Plaintiff's counsel filed a motion seeking leave to amend. (Doc. 15-1 at 10-11, ¶¶ 30-31; *see also* Docs. 19, 21.)

The Court (by Judge Brody) granted leave, and Plaintiff filed an Amended Complaint. (Docs. 25-27.) In the Amended Complaint, he pled additional facts in support of his claims against Hospital and Dr. McAllister and joined as defendants Medical Associates, Radiology Group, Orthopaedic Speciality, Urology Health, and Drs. Wanner, Breckenridge, Domeracki, Star, Ilyas, and Charles, pleading similar negligence claims against each of them, and adding them to the original survival and wrongful death claims. (*Id.*) The Amended Complaint also added a punitive damages claim collectively against all defendants. (*Id.*)

After the close of discovery, Radiology Group, radiologists Drs. Domeracki and Breckenridge, Medical Associates, and internist Dr. Wanner moved for summary judgment on statute of limitations grounds. (Doc. 111.) Urology Health, urologist Dr. Charles, Orthopaedic Specialty, orthopaedist Dr. Star, and then-orthopaedics resident Dr. Ilyas also separately moved for summary judgment on statute of limitations grounds. (Docs. 112-117.) Plaintiff filed an omnibus response in opposition. (Docs. 119-121.) Each group of Moving Defendants then filed replies to Plaintiff's omnibus response. (Docs. 127-130.) The motions are thus now ripe for disposition.

## II.      SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits, show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue is "genuine" if the evidence "is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is "material" if it might affect the outcome of the case under governing law. *Id.*

## III.      DISCUSSION

The basic facts upon which Moving Defendants seek summary judgment are not in dispute. Plaintiff's decedent, James Stroud, died on October 30, 2004, and Plaintiff filed his initial Complaint on October 30, 2006. Plaintiff's Complaint pleaded claims only against Hospital and Dr. McAllister. It did not assert claims against Moving Defendants. The Radiology Report, which Plaintiff contends is "the critical medical record that has now become a lynchpin of the claims against these defendants" (Doc. 122-1 at 1), was not produced to Plaintiff until February 7, 2002, more than three months after the limitations period had run. On March 12, 2007, Plaintiff sought leave to amend his Complaint and join Moving Defendants. Leave was granted on May 7, 2007. Plaintiff then filed his Amended Complaint, finally asserting claims against Moving Defendants, on May 14, 2007.

It is similarly undisputed that Pennsylvania's two-year statute of limitations, 42 Pa. C.S.A. § 5524, governs Plaintiff's claims against Moving Defendants. The issues before us are limited to whether the accrual or running of the limitations period was tolled by the discovery rule or fraudulent concealment doctrine, and alternatively whether Plaintiff's joinder of Moving Defendants otherwise related back to the date Plaintiff's initial Complaint was filed.

16

Moving Defendants contend that under Pennsylvania law the discovery rule does not apply to survival and wrongful death claims, such that the statute of limitations accrued at the latest upon James Stroud's death. (Doc. 111-1 at 10; Doc. 113 at 6-7.) They further contend that, even if the discovery rule is found applicable to Plaintiff's claims, Plaintiff failed to exercise reasonable diligence in investigating his claims, such that the accrual of the limitations period would not be tolled in any event. (Doc. 111-1 at 10-15; Doc. 113 at 7-10.) Moving Defendants also argue that the running of the limitations period was not tolled by the fraudulent concealment doctrine in that, among other things, Plaintiff knew or should have known of his potential claims prior to the expiration of the limitations period, notwithstanding nonproduction of the Radiology Report, and Plaintiff has failed to present evidence suggesting affirmative acts of concealment by many of Moving Defendants. (Doc. 111-1 at 15-17; Doc. 113 at 10-12.) Finally, Moving Defendants contend that Plaintiff's joinder of them as defendants does not relate back under Fed. R. Civ. P. 15(c) to the date of filing the initial Complaint. (Doc. 111-1 at 17-23; Doc. 113 at 12-31.)

Plaintiff counters that the present case is distinguishable from Pennsylvania Supreme Court precedent holding that the discovery rule does not apply to survival and wrongful death cases. (Doc. 122-1 at 50-56.) He further argues that he exercised reasonable diligence in investigating his claims, but notwithstanding that diligence, he was unable to discover the Radiology Report that serves as the "lynchpin" of his claims against Moving Defendants. (*Id.* at 20-44.) Plaintiff contends that nonproduction of the Radiology Report was affirmative concealment, attributable to all of Moving Defendants, sufficient to trigger the fraudulent concealment doctrine and toll the running of the limitations period. (*Id.* at 21 n.5, 44-50.) Finally, Plaintiff argues that Pennsylvania state law, not Fed. R. Civ. P. 15(c), governs the statute of limitations issues. (*Id.* at 56-57.)

17

We address the arguments concerning the discovery rule, fraudulent concealment doctrine, and Rule 15(c) in turn.

### A. The Discovery Rule Did Not Toll the Accrual of the Statute of Limitations

Under clear and settled Pennsylvania law, the discovery rule does not apply to toll the accrual of the statute of limitations in wrongful death and survival actions. *See Pastierik v. Duqesne Light Co.*, 526 A.2d 323, 326-27 (Pa. 1987); *Pennock v. Lenzi*, 882 A.2d 1057, 1060-61 (Pa. Commw. Ct. 2005); *see also Bartow v. Cambridge Springs SCI*, C.A. No. 06-102, 2007 WL 543060, *4-5 (W.D. Pa. Feb. 16, 2007). The Pennsylvania Supreme Court held in *Pastierik*:

> Because death is a definitely ascertainable event, and survivors are put on notice that, if an action is to be brought, the cause of action must be determined through the extensive means available at the time of death, there is no basis to extend application of the discovery rule to permit the filing of survival actions, or wrongful death actions, at times beyond the specified statutory period.

526 A.2d at 327. It accordingly found that an action for wrongful death accrues at the decedent's death, and an action for survival accrues when the decedent knew or reasonably should have known of the injury, but at the latest, at the decedent's death. *Id.* at 326-27. The court further explained its reasoning in finding the discovery rule inapplicable to wrongful death and survival actions:

> Upon the death of an individual, survivors are put on clear notice thereof, and they have the opportunity to proceed with scientific examinations aimed at determining the exact cause of death so that a wrongful death action, if warranted, can be filed without additional delay. Such examinations, including autopsies, are designed to make a final determination as to the cause of death, and they are not restrained or limited in their scope, as would be examinations of living persons, by the need to avoid intrusive or destructive examination procedures.

*Id.* at 326. As recently as 2005, Pennsylvania's Commonwealth Court recognized the continued

vitality of the rule and applied it to bar untimely death claims.  *See Pennock*, 882 A.2d at 1060-61.

Federal courts in Pennsylvania equally apply the rule of *Pastierik* without question.  *See Bartow*,

2007 WL 543060 at *4-5.  In short, it is blackletter law in Pennsylvania that "[t]he discovery rule

does *not* apply to wrongful death or survival actions."  Pa. Suggested Std. Civ. Jury Instructions §

18.01, *Note* (emphasis in the original).

      Plaintiff's arguments that the rule of *Pastierik* does not apply to cases where the alleged

"lynchpin" evidence supporting the claim is not revealed until after the running of the statute or that

the *Pastierik* rule is no longer controlling authority in light of Pennsylvania's certificate of merit

("COM") requirement are unpersuasive.  (Doc. 122-1 at 50-56.)  Plaintiff cites no authority that

supports these arguments and our independent research reveals none.

      The recent *Bartow* decision from the Western District of Pennsylvania moreover illustrates

why Plaintiff's arguments lack merit.  Similar to Plaintiff here, the *Bartow* plaintiff argued that the

autopsy report that revealed the cause of her decedent's death was not produced until nearly four

months after the death, and therefore, the limitations period should not begin to run until that time.

2007 WL 543060 at *5.  If anything, the autopsy report in *Bartow* was more critical in illuminating

the plaintiff's cause of action than the Radiology Report alleged to be the "lynchpin" of the case

here.  The autopsy report in *Bartow* provided the plaintiff with the first medical evidence of the cause

of her decedent's death.  *Id.* at *3.  In contrast, Plaintiff already possessed the second radiology

report dated October 29, 2004 that reported very similar findings.  The October 28, 2004 Radiology

Report stated "[o]ne cannot be certain if there is an obstructing lesion in this location or if there is

adynamic ileus or ischemia," and the October 29, 2004 report similarly concluded "[f]indings may

represent bowel obstruction or ileus . . . [b]owel obstruction cannot be excluded."  (Doc. 122-4 at

Ex. 3; Doc. 112-6, Ex. 4B at PL 0183.)  Yet, the *Bartow* court dismissed that argument out of hand

in light of *Pastierik*.  *See* 2007 WL 543060 at *5.

Additionally, *Bartow* was a case that specifically involved medical malpractice claims and

post-dated the adoption of Pennsylvania's COM requirement, yet featured no mention of any concern

that the rule of *Pastierik* had been undermined by the advent of the COM requirement.  Moreover,

that requirement itself expressly provides for extensions of time to secure and file a COM in the

event that additional time is needed for a plaintiff's expert to obtain and review relevant records.

*See* Pa. R. Civ. P. 1042.3(d) & *Note*.

We thus reject Plaintiff's arguments that the rule laid out by the Pennsylvania Supreme Court

in *Pastierik* is inapplicable to this case and hold that the clear and settled law of Pennsylvania

provides that the discovery rule does not apply to toll the accrual of the statute of limitations on

wrongful death or survival claims.  The statute of limitations on Plaintiff's claims thus began to run

upon James Stroud's death on October 30, 2004.[5]

> **B.     The Fraudulent Concealment Doctrine Did Not Toll the Running the
> Limitations Period**

Although the discovery rule is inapplicable to this case, the related fraudulent concealment

doctrine may apply to toll the running of the limitations period after Plaintiff's claims accrued.

While similar in application and effect, the discovery rule and fraudulent concealment doctrine are

distinct rules under Pennsylvania law.  *See Fine v. Checcio*, 870 A.2d 850, 858 & 860 (Pa. 2005).

---

[5]Because we find that the discovery rule does not apply to this case, we do not consider
Moving Defendants' alternative argument that the discovery rule would not apply in any event
because Plaintiff failed to exercise reasonable diligence in investigating his potential claims –
although we do consider below the related "reasonable diligence" aspects of Plaintiff's fraudulent
concealment argument.

The discovery rule acts to toll the *accrual* of the statute of limitations during the time in which the plaintiff is unable through reasonable diligence to discover the injury and its cause, whereas the fraudulent concealment doctrine tolls the *running* of the statute of limitations due to a defendant's concealing conduct.  *See id.*

### 1.    The Fraudulent Concealment Doctrine

The doctrine of fraudulent concealment  "is based on a theory of estoppel."  *Id.* at 860.  It directs that a "defendant may not invoke the statute of limitations, if through fraud or concealment, he causes the plaintiff to relax his vigilance or deviate from his right of inquiry into the facts."  *Id.* Where the plaintiff establishes that fraudulent concealment has occurred, the running of the limitations period is tolled until the plaintiff knew or through reasonable diligence should have known of the claim. *Jackson-Gilmore v. Dixon*, No. Civ. A. 04-03759, 2005 WL 3110991, *5 (E.D. Pa. Nov. 18, 2005) (quotation omitted); *see Fine*, 870 A.2d at 861.

The plaintiff who asserts fraudulent concealment bears the burden of proving "by clear, precise, and convincing evidence" that the doctrine applies.  *Fine*, 870 A.2d at 860; *Molineux v. Reed*, 532 A.2d 792, 794 (Pa. 1987).  The question of whether the alleged acts of concealment actually transpired is a factual issue that, if disputed, is the province of the jury.  *Fine*, 870 A.2d at 860 (*citing Nesbitt v. Erie Coach Co.*, 204 A.2d 473, 476 (Pa. 1964)).  However, the question of "whether an estoppel results from established facts" is a question of law for the court.  *Id.*  Thus, if there is no genuine dispute of material fact, application of the fraudulent concealment doctrine becomes a legal question that is properly resolved by the court through summary judgment.  *See id.*

To establish that the fraudulent concealment doctrine applies, the plaintiff must first prove that the defendant "has engaged in an affirmative or independent act of concealment that would

divert or mislead the plaintiff from discovering the injury or its cause." *Jackson-Gilmore*, 2005 WL 3110991 at *6 (quotation omitted). "[U]nintentional fraud or concealment is sufficient" to meet this showing, and it is not necessary to prove that the defendant had an intent to deceive. *Molineux*, 532 A.2d at 794. However, "[m]ere mistake, misunderstanding or lack of knowledge is insufficient." *Id.* Importantly, as a principle based upon estoppel, the plaintiff must show that the alleged fraud or concealment is chargeable against each defendant whom the plaintiff argues should be estopped from asserting the statute of limitations. *See id.* ("This alleged fraud or concealment was only chargeable, of course, to Defendant-Appellant Taylor Hospital. The other Defendant-Appellants could not, therefore, be properly held to be estopped to raise the statute of limitations defense because of Taylor Hospital's conduct, and the trial court summarily concluded the same.").

Once fraudulent concealment has been established, the running of the limitations period is deemed tolled during such time when the plaintiff could not through the exercise of reasonable diligence discover his injury and its cause. *Fine*, 870 A.2d at 860-61. Reasonable diligence requires that the plaintiff undertake "a reasonable effort to discover the cause of an injury under the facts and circumstances present in the case." *Jackson-Gilmore*, 2005 WL 3110991 at *7 (*quoting Crouse v. Cyclops Industries*, 745 A.2d 606, 611 (Pa. 2000)). The question of when a reasonably diligent plaintiff would have discovered an injury and its cause is generally a factual question for determination by a jury. *Fine*, 870 A.2d at 858-59, 861. However, where reasonable minds could not differ as to whether the plaintiff knew or reasonably should have known of the claim, the court may properly determine the question as a matter of law. *Id.*; *see Pocono Int'l Raceway*, *Inc. v. Pocono Produce, Inc.*, 468 A.2d 468, 471 (Pa. 1983); *see also Citsay v. Reich*, 551 A.2d 1096, 1099 & 1100-01 (Pa. Super. 1988).

In summary, to establish fraudulent concealment, Plaintiff must prove: (1) that each defendant against whom estoppel is sought engaged in an affirmative act of fraud or concealment that served to mislead Plaintiff as to the existence of his claims; and (2) that Plaintiff did not otherwise know of his potential claims, nor could he have discovered his potential claims through the exercise of reasonable diligence.  The only theory of concealment that Plaintiff has advanced is the nonproduction of the Radiology Report prior to the expiration of the two-year limitations period. In that we find it dispositive, we first review the reasonable diligence prong of the fraudulent concealment test.

> **2.      Plaintiff Knew or Reasonably Should Have Known of His Potential Negligence Claims Against Moving Defendants Without the Radiology Report**

Plaintiff argues vigorously that he was more than diligent in investigating his claims and requesting the necessary records from the defendants.  He contends, however, that Hospital nonetheless failed to produce the Radiology Report that is the "lynchpin" of his claims against Moving Defendants.  Plaintiff argues that the Radiology Report is the "*only* evidence that the Defendants knew, or should have known, on 10/28/04 that Plaintiff's decedent was suffering from a gastrointestinal ileus, a potentially life-threatening condition, and discharged him from the hospital in spite of that fact."  (Doc. 122-1 at 27-28 (emphasis in the original).)

Moving Defendants contend with equal vigor that Plaintiff failed to exercise reasonable diligence in investigating his claims.  First, they argue that the records produced in response to Plaintiff's pre-Complaint requests contain several references to the October 28, 2004 CT scan having been performed, such that Plaintiff was on notice to request the Radiology Report to the extent it was not otherwise produced.  (Doc. 111-1 at 10-15; Doc. 113 at 8-10.)  Second, they contend that the

23

other records produced gave Plaintiff ample notice of the respective roles played by Moving Defendants in James Stroud's treatment and any potential negligence claims against them. (Doc. 113 at 8-10.)

We are not convinced that Moving Defendants' first contention is of sufficient weight to support summary judgement, but we do agree with Moving Defendants that no reasonable jury could reach any conclusion other than to be satisfied that the delayed production of the Radiology Report should not have precluded Plaintiff from proceeding with his potential claims against them in a timely manner. Accordingly, we conclude that the fraudulent concealment doctrine does not apply. *See Davis v. Grusemeyer*, 996 F.2d 617, 624 (3d Cir. 1993) ("[F]raudulent concealment may toll the statute only if it *misleads* a plaintiff . . . ." (emphasis added)).

Contrary to Plaintiff's contention, the Radiology Report is far from the only evidence to establish that Moving Defendants "knew or should have known" of James Stroud's health emergency. Indeed, we reluctantly conclude from our review of the record that there was a substantial factual basis upon which to reasonably conclude that James Stroud had been medically injured and the cause of that injury. *See Fine*, 870 A.2d at 860-61; *Jackson-Gilmore*, 2005 WL 3110991 at *7. Plaintiff's firsthand knowledge of his father's symptoms, the report of the autopsy Plaintiff had performed on his father, and the extensive medical records Plaintiff requested and received prior to the expiration of the limitations period remove, in our opinion, any question of material fact about the extent of information available.

Plaintiff was aware of the symptoms of James Stroud's ileus or bowel obstruction before James expired. Both he and his sister testified that they visited James and spoke with him each day after the knee surgery through the date of his death. (*See* Doc. 127-2 at Exs. D & E.) James

24

repeatedly voiced his complaints that he was nauseous, vomiting, and had not had a bowel movement.  (Doc. 127-2, Ex. D at 52, 63-64, 80, 85, Ex. E at 25-26, 29, 40.)  Both Plaintiff and his sister noted that his stomach was distended.  (Doc. 127-2, Ex. D 80, 85, Ex. E at 40.)

James Stroud's symptoms, and the fact they did not improve, but progressively worsened, were well-documented throughout the medical records Plaintiff requested and received prior to the expiration of the limitations period.  His complaints of nausea and vomiting were referenced in multiple records.  (*See* PL 0014, 0099, 0126-0127, 0139-0140, 0147, 0154, 0158, 0161, 0162-0164, 0169, 0183, 0397-0398, 0316, 0383-0384.)  The fact that he had not had a bowel movement since prior to the knee replacement surgery, for which he was being given laxatives, was equally well-documented.  (*See* PL 0019, 0024, 0039, 0059, 0074, 0079,  0162-0164, 0392, 0315, 0334.)

While knowledge of these symptoms alone might not provide Plaintiff with the basic facts arguably supporting his claim, they are further explained by two key analyses by medical professionals: the October 29, 2004 radiology report; and the February 21, 2005 autopsy report.  The October 29, 2004 radiology report, dictated the day after the late-produced Radiology Report, stated in relevant part:

> There is marked distention of bowel, particularly small bowel.  Gas also appears [to] be present within the colon.  Findings may represent bowel obstruction or ileus.  It is difficult to further characterize. There is density in left upper quadrant which may represent fluid filled stomach.  Free air cannot be evaluated for adequately on these limited study.   Impression: Limited study shows dilated bowel. Bowel obstruction cannot be excluded.

(PL 0183.)  The autopsy report further states:

> Internally, the most serious acute pathologic finding was the presence of gastrointestinal ileus with extensive fluid accumulation.  This finding suggests that [James Stroud's] gastrointestinal tract was not

> functioning properly and fluid was accumulating within. Ileus is a
> recognized post operative complication.

(PL 0685.) Both of these documents were produced to Plaintiff well before the expiration of the limitations period.

Moreover, with the possible exception of Dr. Breckenridge, who authored the Radiology Report, the respective roles of each of Moving Defendants in James Stroud's care was readily apparent from the records produced prior to litigation. (*See, e.g.*, Doc. 112-2 to -6, Ex. 3A at PL 0004 (Drs. Star and Ilyas); Ex. 3B at PL 00046-0058 (Drs. Star and Ilyas); PL 0074 (Dr. Charles); Ex. 3C at PL 0079 (Dr. Charles); Ex. 4B at PL 0183 (Dr. Domeracki).) Importantly, the late-produced Radiology Report does not identify any of Moving Defendants, except for its author, Dr. Breckenridge.

There was thus significant pre-Complaint evidence that James Stroud was suffering from an ileus or bowel obstruction and that Plaintiff may have negligence claims against the medical professionals known to have participated in James Stroud's care – including Moving Defendants – for negligently failing to treat the condition. While we agree with Plaintiff that the Radiology Report is very important evidence and, from Plaintiff's perspective, might be said to tend toward establishing a culpable mental state of recklessness, we are unable to conclude, as Plaintiff suggests, that it could reasonably be said to constitute the necessary element to prove negligence. Accordingly, the discovery of this evidence cannot serve as a basis for Plaintiff's first realization that he may have potential negligence claims against Moving Defendants, and the fraudulent concealment doctrine will not toll the running of the limitations period on Plaintiff's claims.

26

### C.   Plaintiff Also Failed to Present Evidence of Affirmative Acts of Concealment Chargeable Against Moving Defendants Other than Dr. Star and Orthopaedic Specialty

Although we find the fraudulent concealment doctrine inapplicable against all Moving Defendants, we additionally find that, with the exception of Dr. Star and Orthopaedic Specialty, Plaintiff failed to present evidence of any affirmative acts of concealment by Moving Defendants sufficient to trigger that tolling doctrine.  Under Plaintiff's articulated fraudulent concealment theory, to establish an affirmative act of concealment by one of the defendants in this case, Plaintiff must in essence demonstrate that he properly requested medical records from that defendant, that the defendant possessed the Report before the lawsuit was filed, and that the defendant failed to produce it to Plaintiff despite the request.

During the course of discovery, Plaintiff elicited testimony tending to suggest that, among Moving Defendants, the Radiology Report was contemporaneously distributed to Dr. Star, Dr. Ilyas, and Medical Associates.[6]  (Doc. 122-14, Ex. 13 at 62-63.)  This evidence of possession would also be attributable to Orthopaedic Specialty, Dr. Star's employer.  Plaintiff further elicited testimony tending to suggest that the Radiology Report was distributed to Dr. Charles through Dr. Crispen, a urology resident under his supervision, and the evidence of Dr. Charles' possession would also be attributable to his employer, Urology Health.  (*Id.*)  Presumably, the Radiology Report's author, Dr. Breckinridge, also possessed it pre-suit, and that possession would be attributable to his employer, Radiology Group.

_____

[6]We recognize that Moving Defendants deny having received the Radiology Report prior to this litigation and note that contemporaneous receipt of the Radiology Report is one of the principle disputed issues of material fact that, were it necessary to resolution of Moving Defendants' statute of limitations defenses, would have to be tried to a jury.

27

The record is clear that prior to the expiration of the limitations period and commencement of this litigation, Plaintiff requested James Stroud's medical records from Hospital, Dr. Star/Orthopaedic Specialty, Hospital's Emergency Department, Dr. Maron, Brookside, and Second Alarmers.  (Doc. 112-1 at 2-3, Docs. 112-2 to -13 at Exs. 2, 5A-15; Doc. 111-1 at 5-6; Doc. 15-1 at 4, ¶ 13.)  No evidence has been presented to suggest that records were ever requested from Medical Associates, Dr. Wanner, Dr. Breckenridge, Dr. Domeracki, Radiology Group, Dr. Charles, Urology Health, or Dr. Ilyas.  (*See, e.g.*, Doc. 128-2 at Ex. A.)

Plaintiff has therefore failed to present any evidence tending to show that Medical Associates, Dr. Wanner, Dr. Breckenridge, Dr. Domeracki,[7] Radiology Group, Dr. Charles, Urology Health, or Dr. Ilyas both possessed the Radiology Report prior to this litigation and failed to produce it to Plaintiff in response to his request.  He has therefore failed to establish an affirmative act of concealment by any of these Moving Defendants, or to even create a disputed issue of material fact as to any of them sufficient to preclude summary judgment.  *See, e.g., Molineux*, 532 A.2d at 794-95.

Plaintiff has, however, produced evidence tending to show that the Radiology Report was contemporaneously distributed to Dr. Star and Orthopaedic Specialty and that they did not produce the Radiology Report to him in response to his pre-suit records request.  (Doc. 122-14, Ex. 13 at 62-63; Doc. 112-1 at 2-3, ¶ 8; Docs. 112-5 & -6 at Exs. 5A-5B.)  As Dr. Star and and Orthopaedic Specialty contest that the Radiology Report was in fact contemporaneously distributed to them, this

_____

[7]Dr. Domeracki also argued that no tolling doctrines could be applied to extend the statute of limitations for claims against him because the allegations against him in Plaintiff's original and amended complaints were identical.  (Doc. 111-1at 21-23; Doc. 127-1 at 8.)  In light of our findings that Plaintiff knew or reasonably should have known of his claims notwithstanding nonproduction of the Radiology Report and that Dr. Domeracki cannot be charged with fraudulent concealment, we need not reach this otherwise persuasive argument.

would create a disputed issue of material fact sufficient to preclude summary judgment. (Doc. 122-17, Ex. 16 at 316-19.) However, as we have already found that Plaintiff knew or reasonably should have known of his potential claims against Moving Defendants without the Radiology Report, summary judgment must be entered in favor of Dr. Star and Orthopaedic Specialty nonetheless.

Plaintiff has also argued in a footnote that "[t]he concealment by [the Hospital] is attributable to all of its employees, agents and ostensible agents against whom this lawsuit has been brought." (Doc. 121-1 at 21 n.5.) He fails to cite to any support for this argument, however, and we decline to adopt this argument.

On the one hand, Plaintiff has offered no argument or evidence, nor are we aware of any such evidence, that Hospital was acting as any other defendant's agent with respect to the medical records requests. His separate records requests to Drs. Star and Maron moreover belie Plaintiff's belief in or reliance upon any such agency relationship. On the other hand, to the extent that any of the other defendants were acting as Hospital's agent with respect to the conduct at issue in this litigation, any misconduct or concealment by Hospital, as principal, is not attributable to its agents for purposes of invoking the fraudulent concealment doctrine against them. *See* Restatement (Third), Agency § 7.01 cmt. d ("An agent is not subject to liability for torts committed by the agent's principal that do not implicate the agent's own conduct; there is no principal of 'respondeat inferior.'").

Finally, while we recognize that in some instances actions by a defendant to conceal facts that would reveal the identity of a nonparty that could be a proper defendant can be attributed to the nonparty, there is no suggestion that such circumstance is present here. The cases where courts found the concealment by one party to be attributable to the unnamed nonparty involved closely related entities in circumstances where there was a strong inference that the unnamed nonparty was

29

involved in the concealment.  For example, *Lafferty v. Alan Wexler Agency, Inc.* was a premises liability case where the named defendant – Alan Wexler Agency, Inc. – acted as if a proper defendant and appeared to conduct a merits defense until the statute of limitations expired.  574 A.2d 671, 674-75 (Pa. Super. 1990).  It then moved for dismissal of the action on the grounds that it, the named defendant, did not own the premises and was not a proper party but that the owner of the premises and proper defendant was Alan Wexler in his personal capacity.  *Id.*  Similarly, *Peaceman v. Tedesco* involved a medical malpractice case where the named defendant, surgeon Dr. Edwin W. Shearburn, III proceeded as if defending on the merits until the limitations period expired.  414 A.2d 1119, 1122-23 (Pa. Commw. 1980).  He then moved for dismissal on the grounds that he played no role in the surgery upon which the claims were premised, but rather the surgeon involved was his father, Dr. Edwin W. Shearburn, Jr.  *Id.*  No such close relationship or strong hint of active participation in and coordination of the alleged concealment is present in this case and thus there is no reason to attribute nonproduction of the Radiology Report by Hospital to any of Moving Defendants under a concealment of identity theory.  *See, e.g.*, *Hubert v. Greenwald*, 743 A.2d 977, 981 (Pa. Super. Ct. 1999) (acknowledging that in appropriate cases the statute of limitations may be tolled where a defendant or its agent actively misleads the plaintiff as to the identity of proper defendants, but affirming the denial of leave to join a new defendant after the expiration of the limitations period under the facts presented); *Zlakowski v. PennDOT*, 43 Pa. D.&C.3d 186, 190 (C.P. 1986) ("Any alleged fraud or concealment sufficient to estop a defendant from invoking the bar of the statute of limitations has no connection to defendant Penn Central [whom the plaintiff sought to add].  Penn Central has neither concealed nor defrauded plaintiff in this action and may freely invoke the bar of statute of limitations. . . ."), *aff'd* 624A.2d 259 (Pa. Commw. 1993).

Accordingly, in addition to finding that Plaintiff knew or reasonably should have known of his claims without the Radiology Report, we also find that Plaintiff failed in any event to present evidence of any affirmative act of concealment by any of Moving Defendants, other than Dr. Star and Orthopaedic Specialty.[8]

C.  **Plaintiff's Claims Against Moving Defendants Do Not Relate Back Under Fed. R. Civ. P. 15(c) to the Date of Filing the Initial Complaint**

Although the Pennsylvania state-law tolling principles of the discovery rule and the fraudulent concealment doctrine do not apply to Plaintiff's claims against Moving Defendants for the reasons set forth above, Plaintiff's claims would be preserved if they relate back under Fed. R. Civ. P. 15(c) to the date Plaintiff filed his initial Complaint.

Anticipating that Plaintiff would attempt to invoke Rule 15(c), Moving Defendants argued in their initial moving papers that Plaintiff's joinder of them after the expiration of the limitations period would not relate back under the Rule.  Specifically, they argued that Fed. R. Civ. P. 15(c)(1)(A) is inapplicable because Pennsylvania law is not more favorable on relation back then the Federal Rule.  (Doc. 113 at 13-14.)  They further argued that the claims do not relate back under Fed. R. Civ. P. 15(c)(1)(C) in that the claims against them did not arise out of "the conduct, transaction, or occurrence set out . . . in the original pleading," they did not receive actual or constructive notice of the action within 120 days of its commencement, and Plaintiff's election not to sue them within the applicable limitations period was not the result of mistake.  (Doc. 111-1 at 18-22; Doc. 113 at

---

[8]By singling out Orthopaedic Specialty and Dr. Star we are not suggesting that these defendants concealed anything.  We only suggest that there is some evidence that they may have been provided with the Report and it is clear that they did not produce it.  We acknowledge their position that they were never in fact provided with it.  We make no judgment one way or another on this point.

14-31.)

Plaintiff, however, elected not to attempt to rely upon the relation-back doctrine set out in Fed. R. Civ. P. 15(c).  Rather, he responded that "Pennsylvania law, not federal law [] governs the tolling or suspension of the statute of limitations in a case such as the one before the Court" and characterized Moving Defendants' Rule 15(c) argument as "lunacy." (Doc. 122-1 at 56.)  Although contending that Rule 15(c) is inapplicable to this case, Plaintiff also stated in conclusory fashion that "there can be no real dispute" that the Rule's requirements for relation back are met.  (*Id.* at 57.) However, he cited no precedent and references no evidence in support of this contention.

Based on Plaintiff's denial that Fed. R. Civ. P. 15(c) applies to this case, Moving Defendants countered in reply that he has waived any argument that the Rule saves his untimely claims.  (Doc. 127-1 at 6-7; Doc. 128-1 at 10-11; Doc. 130 at 7-8.)  We agree with Moving Defendants that Plaintiff waived any Rule 15(c) argument by failing to assert such argument when the issue of relation-back was squarely raised by Moving Defendants in their papers.   Under well-settled summary judgment procedure, once the moving party successfully establishes the apparent absence of any genuine dispute of material fact and an entitlement to judgment as a matter of law based on the undisputed factual record, the burden shifts to the nonmovant to establish a genuine issue for trial.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  In response to Moving Defendants' Rule 15(c) arguments, however, Plaintiff contended that that Rule is inapplicable.  This Court is not obligated to consider arguments that a "party fails to articulate." *Blue Cross & Blue Shield of Alabama v. Weitz*, 913 F.2d 1544, 1550 (11th Cir. 1990).  "Presenting such arguments in opposition to a motion for summary judgment is the responsibility of the non-moving party, not the court. . . ." *Id.*  Moreover, it is well-settled that

32

arguments not made to the trial court cannot be raised for the first time on appeal.  *See, e.g.*, *Childers v. Joseph*, 842 F.2d 689, 694 n.4 (3d Cir. 1988).  Accordingly, because Plaintiff declined to assert any argument that his joinder of Moving Defendants relates back under Fed. R. Civ. P. 15(c) to the date he filed his initial Complaint, we find that he has waived such argument.

Even were we to construe as a substantive response on the merits Plaintiff's conclusory statement that "there can be no real dispute" that the requirements of Rule 15(c) were met, we would still find based on the record before us that Plaintiff has failed to establish that the joinder of Moving Defendants relates back to the date he filed his initial Complaint.  In relevant part, Fed. R. Civ. P. 15 provides:

> (c) Relation Back of Amendments.
>
> (1) When an Amendment Relates Back. An amendment to a pleading relates back to the date of the original pleading when:
>     (A) the law that provides the applicable statute of limitations allows relation back;
>     (B) the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out–or attempted to be set out–in the original pleading; or
>     (C) the amendment changes the party or the naming of the party against whom a claim is asserted, if Rule 15(c)(1)(B) is satisfied and if, within the period provided by Rule 4(m) for serving the summons and complaint, the party to be brought in by amendment:
>         (i) received such notice of the action that it will not be prejudiced in defending on the merits; and
>         (ii) knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity.

Fed. R. Civ. P. 15(c).

Initially, we note that Rule 15(c)(1)(A) applies only where the law providing the limitation period – here, Pennsylvania law – affords a more forgiving relation back principle than does Rule

15(c).  *See Nelson v. County of Allegheny*, 60 F.3d 1010, 1014 n.4 (3d Cir. 1995).  Pennsylvania law does not afford a more forgiving relation back principle, so Rule 15(c)(1)(A) is inapplicable.  *See id.*

Fed. R. Civ. P. 15(c)(1)(C), which governs amendments joining new parties, is therefore the applicable rule.  It provides a three-part test for determining whether claims against a defendant joined after the expiration of the statute of limitations relate back to the date of filing the initial Complaint.  First, the claims must arise out of the same conduct, transaction, or occurrence pled in the original complaint – that is, there must be a "common core of operative facts" between the original complaint and the amended complaint.  *See Bensel v. Allied Pilots Ass'n*, 387 F.3d 298, 310 (3d Cir. 2004).  Second, the newly-added defendants must have received sufficient notice of the litigation within 120 days of its commencement that they would not be prejudiced in defending the action on the merits.  *See Singletary v. Pa. Dep't of Corrections*, 266 F.3d 186, 194 (3d Cir. 2001).  Third and finally, the defendant must know or reasonably should have known within 120 days of the filing of the complaint "that the action would have been brought against it, but for a mistake concerning the proper party's identity."  Fed. R. Civ. P. 15(c)(1)(C)(ii).

Plaintiff failed to establish the first prong of the relation back test in that his claims against Moving Defendants do not arise from the same common core of operative facts Plaintiff pled in his initial Complaint.  *See Bensel*, 387 F.3d at 310.  The facts alleged in Plaintiff's initial Complaint relate to James Stroud's second admission to Hospital, after having been discharged to Brookside, while the claims against Moving Defendants all concern the medical care and treatment provided to James Stroud prior to his discharge to Brookside.  (Doc. 15-1 at 2-3, ¶ 7.)  As Plaintiff himself admitted when he first sought leave to join Moving Defendants:

34

> The claims and causes of action alleged in Plaintiff's Complaint focus primarily on the acts and omissions of Defendants [Hospital] and McAllister during the period of time *after* Plaintiff's decedent's return to [Hospital] from Brookside. As more fully set forth below, Plaintiff's Complaint did not set forth with specificity claims and causes of actions of action against Defendant [Hospital], its employees, agents and ostensible agents arising out of the care and treatment rendered to Plaintiff's decedent *before* his discharge to Brookside . . . .

(*Id.* (emphasis in the original).) Importantly, none of Moving Defendants other than Dr. Domeracki played any role in James Stroud's care during his second admission to Hospital.[9] In other words, the claims against Moving Defendants involve a different set of individuals and a different time period than the claims pled in Plaintiff's initial Complaint. The claims against Moving Defendants do not involve the same common core of operative facts as Plaintiff's initial claims, and accordingly, even had Plaintiff not waived the argument, his claims would not relate back to the date the initial Complaint was filed.

Judge Yohn was recently faced with a similar factual circumstance in *Leary v. Nwosu* and found that the claims did not arise from a common core of operative facts. Civ. A. No. 05-5769, 2007 WL 2892641, *5-6 (E.D. Pa. Oct. 2, 2007). The plaintiff in *Leary* originally filed a complaint against various defendants from a state correctional facility alleging denial of medical treatment

---

[9] Dr. Domeracki dictated the October 29, 2004 radiology report interpreting the x-rays taken of James Stroud that day following his readmission to Hospital. (Doc. 127-1 at 16-17, ¶¶ 90-92.) While Dr. Domeracki was involved in James Stroud's care during his second admission to Hospital, Plaintiff identified Dr. Domeracki and his role in James Stroud's care in his initial Complaint, yet he did not name Dr. Domeracki as a defendant at that time. (Doc. 1 at 4-5, ¶¶ 32-34.) Thus, Plaintiff's decision not to name Dr. Domeracki would seem to be legal strategy, rather than mistake of identity, which also precludes relation back. *See Great Northeastern Lumber & Millwork Corp. v. Pepsi-Cola Metropolitan Bottling Co.*, 785 F. Supp. 514, 516 (E.D. Pa. 1992) (finding that claims against a newly-added defendant did not relate back where the decision not to join the defendant earlier appeared to be a tactical decision rather than a mistake).

while incarcerated at the correctional facility.  *Id.* at *1.  After the expiration of the limitations period, the plaintiff sought to amend his complaint to add new claims against entirely new defendants based on the alleged denial of medical treatment during the three-day period immediately preceding his incarceration, during which he was being held at the Southwest Detectives Division in Philadelphia.  *Id.* at *2, 6.  The court found:

> The original complaint did not include any allegations based on events occurring while plaintiff was at Southwest Detectives, nor did it include any allegations based on defendants' actions prior to [the date he was transferred from Southwest Detectives to the correctional facility].  The events at Southwest Detectives took place at a different location, during a different time frame, and involved different parties than those alleged in the original complaint.

*Id.* at *6.  Based on these conclusions, the court held that the claims against the newly-added defendants did not relate back because they did not arise from the same conduct, transaction, or occurrence pled in the original complaint.  *Id.*  While *Leary* is perhaps not directly analogous to this case, we find Judge Yohn's analysis persuasive.[10]

Plaintiff has also failed to satisfy the second and third prongs of the relation back analysis in that he has failed to show that, within 120 days of the commencement of this litigation, Moving Defendants received notice of the action or knew or reasonably should have known that they would

---

[10]Both admissions of James Stroud to Hospital admittedly occurred at the same place and in close temporal proximity, such that it could be argued that Plaintiff's original claims and his claims against Moving Defendants arose out of the same conduct, transaction, or occurrence. However, the fact that different medical professionals were involved in James Stroud's treatment during his first and second admissions, and that none of those medical professionals treated him during both admissions weighs strongly in favor of our finding that the two admissions constitute separate occurrences not deriving from a common core of operative facts.  Plaintiff moreover bears the burden to establish that the joinder relates back, yet he put forth no evidence or argument that the two admissions constituted a single occurrence, and his own contention, to which he must be held, was that they were separate occurrences.  (Doc. 15-1 at 2-3, ¶ 7.)

have been named as defendants but for mistake of identity.  The notice envisioned by the second and

third prongs of the relation-back test may be actual or constructive.  *See Singletary*, 266 F.3d at 195;

*see also Varlack v. SWC Caribbean, Inc.*, 550 F.2d 171, 175 (3d Cir. 1977) (finding sufficient notice

where the newly-added defendant had by chance happened upon a copy of the original complaint

during the relevant time period, noticed a reference to an "unknown employee" and understood that

the reference was to him).

Constructive notice may be imputed to a newly-named defendant under a shared attorney or

identity of interests theory.  *See Singletary*, 266 F.3d at 196-200.  The shared attorney theory is based

on the proposition that "when an originally named party and the party who is sought to be added are

represented by the same attorney, the attorney is likely to have communicated to the latter party that

he may very well be joined in the action."  *Id.* at 196.  The inquiry is whether, based on that shared

representation, notice can be imputed to the newly-added defendant within the 120-day notice period.

*Id.*  The related identity of interest theory provides for imputed notice when "the parties are so

closely related in their business operations or other activities that the institution of an action against

one serves to provide notice of the litigation to the other."  *Id.* at 197 (*quoting* 6A Charles A. Wright

et al., *Federal Practice & Procedure* § 1499 at 146 (2d ed. 1990)).  While the identity of interest

standard is somewhat more amorphous than the shared attorney standard, the emphasis appears to

lie on the closeness of contact between the original and newly-added defendant and the likelihood

that this close relationship caused the newly-added defendant to receive notice of the action within

the 120-day period.  *Id.* at 197-200.

Plaintiff presented no evidence that any of Moving Defendants received actual notice either

of the litigation, or that they were mistakenly not named as defendants, within 120 days of

commencement of the litigation.  Plaintiff first sought leave to amend his Complaint on March 7, 2007, which was 128 days after Plaintiff commenced this case.  (Doc. 15-1.)  Plaintiff did not file his Amended Complaint and serve Moving Defendants until at least two months later.  (Doc. 27.) Even were Moving Defendants deemed to have received notice of Plaintiff's intent to join them on March 7, 2007, the date Plaintiff first sought leave to amend, the 120-day notice period had already elapsed, and Plaintiff presented no evidence that they received any earlier notice.[11]   Plaintiff has therefore failed to establish that any of Moving Defendants had actual notice that this litigation had been commenced, or that they would have been named as defendants within the 120-day notice period but for mistake.

Plaintiff has similarly failed to present evidence sufficient to impute constructive notice to any of Moving Defendants.  For example, though Radiology Group, Drs. Breckenridge and Domeracki, Medical Associates, and Dr. Wanner all share counsel with original defendants Hospital and Dr. McAllister, Plaintiff has presented no evidence to suggest that within 120 days of the commencement of this case, counsel and those Moving Defendants had any communication concerning the pendency or nature of this action.  Indeed, there is no evidence to establish even that those Moving Defendants had established an attorney-client relationship with counsel within 120 days after Plaintiff commenced this case.  While a somewhat looser standard than actual notice, the

---

[11]Plaintiff has also admitted that he received the Radiology Report that he characterizes as the "lynchpin" of his claims by February 7, 2007, still within the 120-day notice period, yet failed to review the Radiology Report and seek leave to amend until after the 120-day notice period had expired.  (Doc. 112-14 at Ex. 22.)  Plaintiff suggests, however, that the 120-day notice period should not be applied in light of "Defendants' fraudulent concealment of the radiology report until 100 days after the lawsuit was originally commenced."  (Doc. 122-1 at 57.)  We find this argument unpersuasive for the same reasons discussed previously with respect to the fraudulent concealment doctrine.

focus of the constructive notice inquiry remains on the likelihood that a newly-added defendant received notice of the litigation *within the 120-day notice period* through some connection with defendants who are already parties to the litigation. *See, e.g.*, *Garvin v. City of Philadelphia*, 354 F.3d 215, 222-27 (3d Cir. 2003). Plaintiff has not, however, presented any such evidence. *See id.* at 226 (rejecting the plaintiff's shared counsel constructive notice theory upon holding that the plaintiff "has not come forth with evidence that gives rise to the inference that [the alleged shared attorney] had any communication or relationship whatsoever with the [defendants to be added] within the 120-day period so as to justify imputing notice to" them).

Accordingly, we find that Plaintiff waived any argument that his claims relate back under Fed. R. Civ. P. 15(c) to the date Plaintiff filed his initial Complaint and would have failed to substantiate such argument in any event.[12]

---

[12]Because we find that Plaintiff waived any relation-back argument and failed in any event to establish that the claims against Moving Defendants arose from the same common core of operative facts alleged in Plaintiff's initial Complaint or that Moving Defendants received actual or constructive notice of the litigation within the 120-day notice period, we need not address the prejudice or mistake prongs.

39

**IV.     CONCLUSION**

Based on the foregoing, we find that neither the discovery rule nor the fraudulent concealment doctrine tolled the accrual or running of the statute of limitations on Plaintiff's claims against Moving Defendants and that the statute ran on October 30, 2006.  We further find that Plaintiff waived any argument that these claims relate back under Fed. R. Civ. P. 15(c) to the date Plaintiff filed his initial Complaint and would have failed to substantiate such argument in any event. Accordingly, Plaintiff's claims against Moving Defendants are thus time-barred.  Summary judgment in favor of Moving Defendants will be granted.

An appropriate Order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ROBERT STROUD, individually and as : CIVIL ACTION
administrator of the ESTATE OF JAMES :
H. STROUD, deceased, :
:
Plaintiff, :
:
v. :
:
ABINGTON MEMORIAL HOSPITAL, :
et al., :
:
Defendants. :   NO. 06-4840

**ORDER**

AND NOW, this 13th day of May 2008, upon consideration of the Motion for Summary
Judgment of Defendants Frank R. Domeracki, M.D., John W. Breckenridge, M.D., the Radiology
Group of Abington, Jeffrey L. Wanner, M.D., and Abington Plaza Medical Association (Doc.
111), and the Motion for Summary Judgment of Defendants Andrew M. Star, M.D., Orthopaedic
Specialty Center, Abington Orthopaedic Specialists, P.C. t/a Orthopaedic Specialty Center, Asif
Ilyas, M.D., Robert S. Charles, M.D., and Urology Health Specialists – Abington (Docs. 112-
117), Plaintiff's responses thereto (Docs. 119-122), and the other submissions of the parties
(Docs. 127-130), it is hereby **ORDERED** that the Motions are **GRANTED** and Plaintiff's
claims against defendants Frank R. Domeracki, M.D., John W. Breckenridge, M.D., the
Radiology Group of Abington, Jeffrey L. Wanner, M.D., Abington Plaza Medical Association
Andrew M. Star, M.D., Orthopaedic Specialty Center, Abington Orthopaedic Specialists, P.C. t/a
Orthopaedic Specialty Center, Asif Ilyas, M.D., Robert S. Charles, M.D., and Urology Health

Specialists – Abington are **DISMISSED WITH PREJUDICE** as time-barred.

BY THE COURT:

/s/ David R. Strawbridge
DAVID R. STRAWBRIDGE
UNITED STATES MAGISTRATE JUDGE